UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TRACY KREGER FRANZEL,

       Plaintiff,                 Civil Action No. 2:12-cv-14293

  v.                        District Judge Stephen J. Murphy, III
                             Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

       Defendant.
_____/

**REPORT AND RECOMMENDATION TO
GRANT IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [16] AND
DENY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [18]**

In December 2001, Plaintiff Tracy Franzel was in a car accident. Soon thereafter, she began having neck pain along with pain and numbness in her arms. After physical therapy and other treatment failed, Franzel underwent cervical-spine surgery, including a fusion of two cervical vertebrae. The fusion was not successful, however, and Franzel continues to suffer from pain. An administrative law judge, acting on behalf of Defendant Commissioner of Social Security, thought that Franzel could work despite her pain. In reaching that conclusion, the ALJ found that Franzel's testimony that her pain and other symptoms caused disabling limitations was not fully credible. On appeal to this Court, Franzel challenges that finding.

The problem for the Court is that the ALJ's credibility assessment is not well explained. Not only does this run afoul of social security regulations and an administrative ruling, it also makes meaningful judicial review difficult. The ALJ also rejected the opinion of one of Franzel's treating sources without adequate explanation. Yet the treating physician opined in a manner that

corroborates critical portions of Franzel's testimony. For these reasons, this case should be remanded to the Commissioner for a proper credibility assessment.

# I. BACKGROUND

*Treatment Prior to Franzel's Cervical Spine Surgery*

Not long after her accident, Franzel began to treat with Dr. Asad A. Mazhari, a Clinical Assistant Professor in Wayne State University's Department of Neurosurgery. (Tr. 270.) Franzel's December 2001 car accident resulted in neck pain emanating down both arms and numbness in both arms, but more so in the right. (Tr. 270.) An MRI showed a disc bulge at C5-C6. (Tr. 270.) After physical therapy and cervical traction did not relieve her pain, Franzel wanted to proceed with surgery. (*See* Tr. 268, 269.) In September 2002, however, Franzel told Dr. Mazhari that she could not do so because no one could take care of her children during recovery. (*See* Tr. 264.) In February 2003, Dr. Mazhari noted, "Her problem is that she takes a lot of medication and we are cautioning her as far as medication." (Tr. 263.) Dr. Mazhari suggested that Franzel see a "pain management physician." (Tr. 263.)

In April 2003, Franzel saw Dr. Pramod Kerkar at the Pain Clinic of Michigan. (Tr. 382.) Franzel was still working as an apartment manager, but her pain was affecting her functional ability and her work. (Tr. 96, 382.) Franzel reported pain in her lumbar region, gluteal muscles, legs (more on the right than the left), and arms (also more on the right than the left). (*Id.*) Franzel was taking Vicodin, Xanax, and Motrin for her pain. (*Id.*)

In 2003, Dr. Kerkar performed several injection-based procedures in an attempt to treat Franzel's pain. (Tr. 161-64.) In May, Dr. Kerkar provided an "epdiural transfer multiple-level injection," a facet block at C5, C6, and C7, and a disc injection at C5, C6, and C7. (Tr 163-64; *see*

2

*also* Tr. 380-81.) In July 2003, Dr. Kerkar provided a facet joint block, disc injection, and transforaminal injection at C5-C6. (Tr. 161-62; *see also* Tr. 380-81.) In August 2003, Brown reported that the procedures reduced her pain by about 30-40%. (Tr. 380.) In September 2003, Dr. Kerkar performed a disc injection at C6, C7 and T1, an epidural injection at C7 and T1, and a facet joint block at C6 and C7. (Tr. 159; *see also* Tr. 377.) It appears that during this period, Franzel continued to work full-time. (*Compare* Tr. 377, *with* Tr. 381.)

By October 2003, however, Franzel's pain had worsened. (Tr. 377.) On October 22, Franzel reported to Dr. Kerkar that she had pain at the three-to-four-out-of-ten level at rest and seven-to-eight-out-of-ten level with activity. (*Id.*) The specialist remarked, "The patient has not been at work at this time because of chronic intractable pain. . . . Pain medication has reduced the intensity of the pain, but overall the patient's consumption of the pain medication has increased over the last two to three years." (Tr. 377.) Dr. Kerkar's diagnoses were cervical radiculopathy, cervical facet joint disease, cervical degenerative disc disease, and disc herniation. (Tr. 377.) He referred Franzel back to Dr. Mazhari. (Tr. 299, 375-76.)

At her November 2003 appointment with Dr. Mazhari, Franzel reported pain in her shoulders, arms, and hands (more on the right than on the left) during activities "such as [placing her] hands above [her] head, any kind of prolonged use, and writing." (Tr. 298-99.) Franzel also stated that, even when not active, she had constant cervical pain that radiated into her trapezius and shoulder at the nine-out-of-ten level. (Tr. 299.) Noting that conservative treatment had failed and that Franzel wanted surgery, Dr. Mazhari wrote, "we will go ahead with surgery." (Tr. 300.)

On November 17, 2003, Dr. Mazhari performed a cervical discectomy, foraminotomy, osteophytectomy and decompression of the nerve roots at C5-C6; he also performed a C5-C6 fusion.

3

(Tr. 166.)

*Franzel's Post-Surgical Pain Leads to An Application for Social Security Benefits*

The surgery did not resolve Franzel's pain. In January 2004, Franzel reported to Dr. Mazhari that she was still having pain that radiated from her neck down into her thoracic region. (Tr. 294.) Franzel also reported numbness in both hands. (*Id.*) Additionally, Franzel was "experiencing lower back pain that . . . radiat[ed] into the right lower extremity." (Tr. 294.) In a section of his notes titled "Functional Impairment," Dr. Mazhari wrote: "Continue wearing brace, driving approximately 10 minutes at a time, restrict activities, no lifting, pushing, pulling greater than ten pounds, restricted flexion and extension." (Tr. 295.) Dr. Mazhari ordered a lumbar-spine MRI which showed degenerative dehydration and minimal bulging at L5-S1. (Tr. 289.)

In February 2004, Dr. Mazhari noted that Franzel was "not feeling any better." (Tr. 290.) Franzel also reported lower-back symptoms, including paresthesias in her legs and multiple episodes of falling down. (*Id.*) As he would often do in later visits, Dr. Mazhari tested Franzel's motor function. (Tr. 291.) Her right leg was weaker than her left but still "4+/5." (*Id.*) Franzel's right grip strength was "4/5" when compared to her left. (*Id.*) Franzel had "slight" weakness in her right biceps and triceps. (*Id.*)

The format of Dr. Mazhari's notes changed slightly in May 2004. (*See* Tr. 286.) He added a section titled "Cervical History" where he provided, "On a scale of 0 to 10 the severity of the pain is an 8 with medication. The pain limits activity to a moderate degree." (Tr. 286.) Dr. Mazhari never modified these two "Cervical History" statements in his subsequent notes. On exam, Franzel's strength was measured in the four- to five-out-of-five range. (Tr. 286.) Dr. Mazhari reduced Franzel's "Functional Impairment[s]" to "[r]estriction flexion and extension of the neck. Continue

4

wearing the brace with physical exertion." (Tr. 287.) Franzel was still taking Vicodin and Dr. Mazhari additionally prescribed Medrol. (*Id.*)

In August 2004, Franzel underwent diagnostic tests and then saw Dr. Mazhari. (*See* Tr. 276.) A lumbar myelogram (a dye-based x-ray) revealed no evidence of disc herniation. (*Id.*) But the cervical myelogram showed "desiccation of the disc and cervical spondylosis at the level of C5-6." (*Id.*) A cervical spine CT scan revealed "collapse of the disc space and lateral recess stenosis at the level of C5-6." (*Id.*) Dr. Mazhari opined, "After reviewing the films with the patient, since the patient says her pain is bad, she cannot sleep and this had been going for a long time and she has quit smoking, I think she needs reoperation at the level of C5-6 with plating." (Tr. 278.)

In September 2004, Franzel filed an application for social security disability insurance benefits. (Tr. 44.) In her application, she alleged that she had become disabled from work on October 17, 2003, apparently her last day of work. (Tr. 44, 377, 548.) In February 2005, Franzel additionally filed an application for supplemental security income under the Social Security Act. (Tr. 44.) In that application she also alleged an October 17, 2003 disability onset date.

*Franzel's Second Cervical-Spine Surgery Is Delayed By Pregnancy*

In the remaining six years covered by the administrative record, Franzel never had a second operation on her cervical spine. Initially, it was delayed by pregnancy. (*See* Tr. 305.) In January 2005, Franzel was six months pregnant and Dr. Mazhari noted that Franzel had discontinued all pain medications, except for Tylenol #3, which her obstetrician and gynecologist had prescribed. (*Id.*) That month, Franzel also saw Dr. Kerkar; she reported that her pain was four out of ten at rest and six out of ten with activities. (Tr. 373.) Dr. Kerkar advised that Franzel postpone injection treatment and that Franzel use a Lidoderm patch instead. (*Id.*) In late March or early April 2005, Franzel gave

birth; Franzel would later report that the delivering physicians were concerned that her neck was not stable enough for natural birth, so they recommended a caesarean section. (Tr. 309.)

*Social Security Administration Requests Exam and Functional Capacity Assessment*

In April 2005, Dr. E. Montasir evaluated Franzel for Michigan's Disability Determination service, a state agency that helps the Social Security Administration evaluate claimants. (Tr. 309.) Dr. Montasir thought that Franzel's gait and stance were unremarkable and that she had "good grip" with both hands. (Tr. 311.) Franzel's straight-leg-raise test was limited to about 60 degrees. (*Id.*) Dr. Montasir found that Franzel "managed" to squat and that heel walking was "difficult." (*Id.*)

The next month, Dr. Issa Claire reviewed Franzel's medical file and completed a Physical Residual Functional Capacity Assessment. (Tr. 147-54.) Dr. Claire thought that Franzel could lift 20 pounds "occasionally," 10 pounds "frequently" (two-thirds of a workday), stand or walk for six hours in an eight-hour workday, sit for six hours in an eight-hour workday, and engage in unlimited pushing and pulling. (Tr. 148.) In terms of postural limitations, Dr. Claire provided that Franzel could only "occasionally" (one-third of a workday) climb stairs, ramps, or ladders, balance, stoop, kneel, crouch, or crawl. (Tr. 149.) Dr. Claire thought that Franzel had no manipulative limitations. (Tr. 150.)

*Franzel Resumes Stronger Pain Medication*

Not long after giving birth, Franzel resumed more aggressive pain management. In May 2005, Dr. Mazhari prescribed Percocet and Soma. (Tr. 367.) The next month, Dr. Mazhari noted, "Tracy [has] not proceeded with the surgery as she recently had a baby and now her mother is currently ill and needs her assistance. However, Tracy does want to proceed with surgery as soon as she is available to do so." (Tr. 360.) The June 2005 "Functional Impairment" section of Dr.

Mazhari's notes list only "[r]estricted flexion and extension of the neck." (Tr. 362.) Although Franzel continued to report increased pain, the July, August, and September 2005 treatment notes form Dr. Mazhari's office are otherwise similar to those from June 2005. (*See* Tr. 340-58.) In September 2005, Dr. Mazhari altered Franzel's medication to Percocet and Robaxin. (Tr. 346.)

In October 2005, another MRI of Franzel's cervical spine was taken. (Tr. 335.) Dr. Mazhari thought it showed a "collapse" of the C5-C6 disc space and a "non-fusion of C5-6." (*Id.*) The professor of neurosurgery further noted, "I think since there is no other problem except the level of C5-6 that is not fused and she has so much neck pain, I recommended that she have surgery. . . . In the meantime we will send her for pain management since she is getting Percocet and Motrin 800 mg and nothing relieves her." (Tr. 337.)

*Franzel Returns to Dr. Kerkar*

In November 2005 and January 2006, Franzel returned to Dr Kerkar for pain management.

In November, Dr. Kerkar noted that Franzel's pain was "moderate" and distributed in her shoulder, arm, forearm, wrist, and hand. (Tr. 371.) Franzel also had "occasional weakness of right arm and abduction." (*Id.*) Dr. Kerkar noted, "Functional assessment was as follows—Patient is active. Patient hasn't requested early refill today." (*Id.*) Elsewhere, however, Dr. Kerkar wrote that Franzel had "restricted indoor and outdoor activities because of pain." (*Id.*) Franzel told Dr. Kerkar that she wanted to continue with "conservative treatment such as medications, and injection treatment." (*Id.*)

In January 2006, Dr. Kerkar remarked, "Patient's pain [is] severe." (Tr. 369.) In particular, Franzel reported her pain to be eight out of ten at rest, and ten out of ten with activities. (*Id.*) Franzel further provided that a December 2005 cervical rhizotomy (a procedure involving cutting spinal

7

nerve roots) provided "0%" pain relief. (Tr. 369.) On exam, "[s]evere pain was elicited at the facet joint C5-7 both . . . sides." (Tr. 370.) Dr. Kerkar continued Franzel on Percocet, Motrin, Soma, and physical therapy; he noted that Franzel would see "Dr. Underwood" for a second opinion. (*Id.*)

About three weeks later, Dr. Kerkar also completed a "Cervical Spine Residual Functional Capacity Questionnaire." (Tr. 385-89.) Dr. Kerkar provided that Franzel's cervical range of motion was limited to 20% for extension and flexion, and she could rotate her head at 40% of normal. (Tr. 385.) He also indicated that Franzel had severe headache pain, in particular, "occipital neuralgia secondary to C2 nerve pain," four to six times per week for two to four hours each time. (Tr. 386.) Dr. Kerkar opined that Franzel's pain and other symptoms would interfere with the attention and concentration needed for even simple work tasks from one-third to two-thirds of the workday. (Tr. 387.) He thought that Franzel could sit for two hours at a time, stand for an hour at a time, but could sit for less than two hours total in a workday and stand/walk for less then two hours total in a workday. (Tr. 388.) Dr. Kerkar opined that Franzel would need four to five breaks during an eight-hour workday, with each break involving lying down or "rest[ing] head on a high back chair" for 10 to 15 minutes. (Tr. 388.) As far as Franzel's upper extremities, Dr. Kerkar provided that while Franzel could use her hands to grasp, turn, or twist objects, and use her fingers to engage in fine manipulations, "100%" of the workday, she could only reach for 20% and 25% of the workday with her right and left arms, respectively. (Tr. 389.)

*Franzel Continues Treatment With Dr. Mazhari*

Based on the administrative record, Franzel treated with only Dr. Mazhari, or Sara Wierzbicki, a physician assistant who worked with Dr. Mazhari, during the remainder of the disability period.

8

Dr. Mazhari's March 2006 notes are similar to those form earlier visits. (*See* Tr. 331-33.) In the "Functional Impairment" section, the neurosurgeon provided, "[r]estricted flexion and extension of the neck." (Tr. 332.) In June 2006, Dr. Mazhari noted, "she had pain management and epidural blocks [which] so far has not helped[;] right hand grip is weaker." (Tr. 327.) The "Functional Impairment" section in the June 2006 notes was left blank. (Tr. 328.) Dr. Mazhari ordered MRIs and an EMG. (Tr. 329.) In November 2006, Dr. Mazhari commented on the diagnostic tests and the opinion of another neurosurgeon (perhaps Dr. Underwood):

> The patient was here today and brought the note of the other neurosurgeon who has seen her. Apparently he did not have access to the MRI. He has said that she does not need surgery. She is here complaining of a lot of neck pain, bilateral arm pain. I reviewed the MRI again and definitely the bone graft at the level of C5-6 is gone and she has non-union of C5-6. We will send [her insurer] a letter in this regard. It is true that her EMG is negative as far radiculopathy but that is not reliable.

(Tr. 318.) The EMG did show mild carpal tunnel. (Tr. 318.) Dr. Mazhari did not list anything under "Functional Impairment." (Tr. 320.)

*Treatment During 2007*

Franzel's cervical-spine condition did not significantly change in 2007, but low-back and lower-extremity pain also became a treatment focus. In February 2007, Dr. Mazhari noted that Franzel "still [had] a lot of neck pain radiating to both arms and she wants to go ahead with surgery but she does not have insurance." (Tr. 391.) He also noted that Franzel had "constant numbness in the bilateral upper [extremities] and hands and in all fingers." (Tr. 391.) He listed nothing under "Functional Impairment." (Tr. 393.) In March 2007, Wierzbicki noted that Franzel was taking Norco five to six times per day without much pain relief. (Tr. 396.) The physician assistant noted that Franzel could not afford Percocet without insurance. (*Id.*) As before, Franzel reported constant

9

throbbing radiating to her legs with intermittent numbness and tingling in her feet. (*Id.*) Wierzbicki provided the following "Functional Impairment[s]": "[r]estricted bending, lifting and twisting, flexion and extension of the neck." (Tr. 398.) Although it is unclear as to whether Franzel ever pursued it, in May 2007, Dr. Mazhari recommended functional capacity testing. (Tr. 403.) "This would optimize return to work and minimize the chance of reinjury. Following [functional capacity testing], work hardening would be a consideration." (Tr. 403.) In July 2007, Franzel told Wierzbicki that she had constant neck pain, numbness and tingling into the first, second, and third fingers, and pain at the eight-out-of-ten level with medications. (Tr. 408.) Franzel also complained of constant low-back pain radiating into her right leg along with foot numbness. (*Id.*) She was, however, going to Tennessee and Florida for a ten-day vacation. (*Id.*) The next month, a lumbar-spine MRI showed "mild degenerative changes at L5-S1 with small disc herniation toward the left side L5-S1." (Tr. 433.) The MRI was otherwise normal. (*Id.*) In September, Franzel told Wierzbicki that of the medications she was taking, Soma, Percocet, Lidocaine cream, and Xanax, only Xanax made her feel sedated. (Tr. 413.) In summarizing Franzel's "Lumbar History," Wierzbicki wrote, "[o]n a scale of 0 to 10, the severity of the pain is 7[] to 9. The pain limits activity to a moderate degree, sitting limitations to 20 minutes, standing limitations to 20 minutes, walking limitations to 5 minutes." (Tr. 413.) On exam, Franzel was able to heel and toe walk, and had four-out-of-five strength in her right large toe, right ankle dorsiflexor, and right deltoid. (Tr. 415.) In November 2007, Dr. Mazhari noted, "[Franzel] says she is worse and the insurance company is not authorizing her surgery and she has to come for medication." (Tr. 417.) Franzel also reported that while she had received injections in the past, she did not know how to obtain one without insurance. (*Id.*) Dr. Mazhari remarked, "I examined her and she definitely has weakness of the right upper extremity, especially the grip is

10

very weak." (*Id.*) Dr. Mazhari's "Functional Impairment[s]" were still "[r]estricted bending, lifting and twisting, flexion and extension of the neck." (Tr. 419.)

*First Administrative Hearing and Disability Determination*

Franzel also received her first determination by an administrative law judge on her applications for social security disability benefits and supplemental security income in 2007.

In May 2007, Franzel testified before Administrative Law Judge Daniel G. Berk. (Tr. 543-69.) Franzel was wearing a wrist brace and a neck brace. (Tr. 549.) Although the neck brace had been prescribed in 2003, she informed ALJ Berk that Dr. Mazhari had told her to wear it following a recent fall. (Tr. 550-51.) Franzel testified that her neck pain, medication, and lower back pain caused headaches "four, five times a week." (Tr. 556.) The headaches required Franzel to lie down in a quiet place which, when combined with medication, provided relief after about a half hour. (Tr. 557.) Franzel testified that Xanax made her "very tired" and that Vicodin caused her to "get very dizzy and fatigued." (Tr. 557.) Franzel stated that she could lift a "two-liter of pop" with difficulty. (Tr. 552.) She stated that the pain in her neck became severe when walking down stairs but she could "manage probably about six" flights. (Tr. 553.) Franzel stated, "If I'm up standing for I'd say 25 to 30 minutes, I would have to then sit down because [my neck pain] becomes too much." (Tr. 558.) Later in her testimony, however, Franzel said that she could stand for an hour, and "[a]fter about an hour, I need—the pain in my neck and back, I need to sit down." (Tr. 562.) Franzel stated that she could walk or stand for an hour-and-half to two hours "on a good day." (*Id.*)

In a June 2007 decision, ALJ Berk concluded that Franzel was not under a "disability" as that term is used in the Social Security Act. (Tr. 44-58.) ALJ Berk essentially found that Franzel could perform the exertional demands of "light" work so long as she could sit and stand as she

pleased and was not required to perform fine manipulations with her right arm. (Tr. 57.) Relying on vocational expert testimony, ALJ Berk concluded that there would be jobs for someone with this functional capacity. (*Id.*)

Franzel appealed ALJ Berk's decision and, in July 2009, the Social Security Administration's Appeals Council vacated his decision and remanded the case for an ALJ to engage in additional fact finding and analysis. (*See* Tr. 28.) According to the Appeals Council, ALJ Berk had neither assigned a weight to Dr. Mazhari's repeated limitation of restricted neck flexion and extension nor incorporated those restrictions into the residual functional capacity assessment. (Tr. 27.) On remand, Franzel's case was again assigned to ALJ Berk. (*See* Tr. 17, 570.) Franzel would again testify before ALJ Berk in October 2010. Meanwhile, she continued to seek treatment for her pain.

*Treatment During 2008*

During 2008, Franzel's pain did not improve, nor did she undergo surgery. In January 2008, Wierzbicki noted, "Still has no insurance but family still working on possibly taking out a loan." (Tr. 422.) Franzel told Wierzbicki that her carpal-tunnel syndrome felt like it was flaring up. (*Id.*) When Franzel mentioned that she would be driving to Illinois (apparently from southeast Michigan), Wierzbicki "[d]iscussed laying down and getting out of [the] van about every [one hour] to stretch." (Tr. 424.) In March 2008, Franzel told Wierzbicki that she had noticed more numbness and tingling in her right hand and feet, but that she also had been doing more work around the house because family members had been sick. (Tr. 427-28.) Franzel was planning to undergo surgery in July or August "once her mother ha[d] recovered from her knee surgery." (Tr. 428.) In May, Franzel reported that her hand numbness had continued to worsen. (Tr. 434.) Franzel was then taking

12

Percocet, Soma, Xanax, and using Lidoderm ointment on her neck, back, and right hand; nonetheless, Franzel's pain was still an eight-and-a-half out of ten. (Tr. 434.) Franzel told Wierzbicki that, although the medication would be less effective, she wanted to switch to Norco because Percocet was too expensive without insurance coverage. (*Id.*) In June 2008, Dr. Mazhari noted, "[s]he is taking a lot of medication and want's [*sic*] to go ahead with neck surgery which we have discussed with her before." (Tr. 440.) In September, Franzel said her pain had not changed since the last visit; she was taking five to eight Percocet and three or four Soma per day; she was also taking Xanax twice nightly. (Tr. 446.) Although Franzel denied side effects, including sedation, Wierzbicki advised a medication change for better pain control and because Franzel had recently been diagnosed with a liver tumor. (*Id.*) In November 2008, Wierzbicki noted that Franzel had tried not taking Soma for five days but noticed "a huge difference in her pain." (Tr. 452.)

*Treatment During 2009*

For most of 2009, Franzel's pain did not improve, but, toward the end of the year, Cymbalta helped reduce her neuropathic pain. In January 2009, Franzel told Wierzbicki that the weather had made her ache more. (Tr. 458.) Franzel was still taking Percocet, Soma, and Xanax; she continued to deny side effects, including sedation. (*Id.*) In February, Franzel said her low-back pain was seven out of ten. (Tr. 464.) Franzel said her legs felt weak at times and gave out on her. (*Id.*) Still, she wanted to "take care of [her] neck first." (*Id.*) In July 2009, Dr. Mazhari noted, "Apparently, her insurance company is going to approve her surgery." (Tr. 482.) As with prior visits, Franzel's "Functional Impairment[s]" were "[r]estricted bending, lifting and twisting, flexion and extension of the neck." (Tr. 484.) In September 2009, Wierzbicki noted that Franzel continued to have "constant neck pain radiating to the [right upper extremity] [with] 'pinching' in the [right] scapula

13

secondary to collapsed disc at prior surgical level, C5-6. [Her] [right] grip is weak." (Tr. 488.) Additionally, Franzel reported that in the prior week-and-a-half, she had experienced burning pain in her feet at night: "she ha[d] to run her feet under cool or warm water for relief." (*Id.*) Wierzbicki wanted to order an EMG, but noted that Franzel's insurance would not pay for it. (*Id.*) The physician assistant prescribed Cymbalta for Franzel's neuropathic pain "and also for Tracy's depression." (*Id.*) In November 2009, Wierzbicki noted that Cymbalta and Soma (four per day) had "really helped her pain and mood [with] the weather." (Tr.495.) Wierzbicki also wrote, "Needs to hold off on surgery until [Tracy's] kids are off from school so most likely won't have done til summer [2010]." (Tr. 497.)

*Treatment During 2010*

In the months leading up to her second administrative hearing before ALJ Berk, Franzel's condition did not significantly improve. In January 2010, Franzel reported to Dr. Mazhari that she had fallen down some steps and struck her neck on something. (Tr. 501.) This increased her pain to eight or nine out of ten. (*Id.*) Franzel wanted to alter her medication to morphine sulfate, an extended release medication that could offer better pain control and allow her to use Percocet and Tylenol less. (*Id.*) Wierzbicki prescribed the medication and informed Franzel that Percocet should be limited to three to four per day. (Tr. 504.) Later that month, another MRI was taken of Franzel's cervical spine. (Tr. 506-07.) It revealed degenerative disc disease with diffuse osteophyte and disc bulge at C5-C6. (Tr. 510.) There was also a "degree of uncal vertebra joint spurring" and encroachment on both the right and left neuroforamen at C5-C6. (*Id.*) At her March 2010 appointment with Wierzbicki, Franzel said that her pain had remained stable since the January visit. (Tr. 510.) She also reported that she had stopped taking morphine sulfate because it made her very

14

tired and affected her breathing. (*Id.*) Franzel had run out of Cymbalta and told Wierzbicki that without the medication, she had noticed a significant difference in her pain, mood, and anxiety. (Tr. 511.) Franzel's "Functional Impairment[s]" were still "[r]estricted bending, lifting and twisting, flexion and extension of the neck." (Tr. 513.) At her May 2010 appointment, Franzel reported that her pain and weakness were the same. (Tr. 517.) She was taking Percocet (six per day), Soma (three or four per day), and Xanax (twice nightly), Cymbalta, and using a Lidocaine ointment. (Tr. 517.) Wierzbicki noted, "Planning surgery in [A]ugust but depends on her disability case which is in [J]une/[J]uly." (*Id.*) In June 2010, Wierzbicki provided that she would "re-order" a TENs unit to help with Franzel's cervical and lumbar pain. (*Id.*) The physician assistant also switched Franzel to oxycodone "for better pain control." (Tr. 526.) Franzel's last appointment reflected in the administrative record was with Dr. Mazhari. (Tr. 528-33.) He provided: "We have been waiting over a year to get approval for surgery. Her disc is collapsed and there's a pinched nerve on the side. She has neck pain radiating down the right upper extremity." (Tr. 530.) Dr. Mazhari continued all of Franzel's medications: Percocet, Soma, Xanax, Cymbalta, and Lidoderm ointment. (Tr. 533.)

*Second Administrative Hearing*

On October 13, 2010, Franzel appeared with her present counsel before ALJ Berk and testified about her impairments and associated functional limitations. (Tr. 570-86.) Franzel began by responding to a question about how her condition had changed since the June 2007 hearing: "I have pain constantly. My lower back as well as my neck has gotten worse. My hand has gotten worse. My headaches have gotten worse." (Tr. 575.) Franzel explained that she was right-handed, and that her right hand was "constant[ly]" "tingly, very numb." (Tr. 576.) "If I pick up a coffee cup a lot of the times, I drop it," she said. (*Id.*) Franzel also told ALJ Berk that she had side effects from

her medications: "I get very sleepy. I'm dizzy sometimes. I can't stand for long periods of time. I have migraines." (*Id.*) Although Franzel suggested that exerting herself by sitting, standing, or walking too long required her to lie down (*see* Tr. 578-79), she also provided that her migraines contributed to that need: "[I lie down] [t]hree to four times, sometimes five. I get migraines very bad, and I lay down . . . . "[I can resume activity in] [t]wenty minutes to an hour depending on a headache or depending on drowsiness." (Tr. 579.) Franzel stated that she could not turn her head suddenly and had limited ability to turn her head to the right or up. (Tr. 577.) According to Franzel, she could sit for about 10 to 15 minutes, stand for five to eight minutes, and walk approximately "four to five car lengths" before having problems. (Tr. 578-79.) Franzel and her counsel explained that she had not had surgery because of issues with Franzel's insurer. (Tr. 573, 578.)

At the hearing, ALJ Berk solicited vocational expert testimony on job availability. (Tr. 581.) He asked the vocational expert to consider a hypothetical individual of Fanzel's age (then 40 years old (*see* Tr. 546, 570)), education (10th grade (Tr. 547)), and work experience (property and theater manager among other prior jobs (Tr. 567)) who could perform "sedentary" work as defined by the social security regulations except that this person would also need to sit or stand at will "with also limited cervical motion and some limitation in the grip strength of [the] dominate extremity." (Tr. 581.) The vocational expert testified that there would be jobs available to this hypothetical person, including "simple assembly, packaging, sorting, as well as entry-level jobs in the security fields, which is lobby attendant, gate attendant, and security monitor." (Tr. 581.) The ALJ then asked the expert, "[i]f we were to accept the claimant's testimony as being entirely truthful and accurate, would that have any preclusive [e]ffect upon the jobs you identified?" (*Id.*) The expert provided that all work would be precluded: "The preclusive [e]ffect, Your Honor, would be a cause for the need

16

to lie down during the day to manage her symptoms." (*Id.*)

Franzel's counsel cross examined the vocational expert. (Tr. 582.) He first asked the expert whether the "assembly, packaging and sorting jobs" required "bilateral manual dexterity." (Tr. 583.) The expert responded, "most do" and that the use of the upper extremities in those jobs would be "continuous." (*Id.*) Franzel's counsel then turned to the security attendant and monitor positions: "are they typically involved with some type of a screen where you would watch either multiple views or rotating view or multiple screens to see if there was some type of activity or someone at a gate or something like that[?]" (*Id.*) The vocational expert thought that about two-thirds of the identified attendant jobs would require that activity, but that the gate attendant position would not. (*Id.*) As to this position, counsel asked about "writing or log keeping"; the expert testified that logging would "generally" be performed by hand and that upper extremity use would be characterized as "[o]ccasional." (Tr. 583-84.)

## II. THE ALJ'S APPLICATION OF THE DISABILITY FRAMEWORK

On November 17, 2010, following the Appeals Council's July 2009 remand, and exactly seven years after Franzel says she became disabled, ALJ Berk issued another opinion on whether Franzel was under a "disability" as that term is used in 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505 (DIB); 20 C.F.R. § 416.905 (SSI). (Tr. 11-17.) He reached his conclusion by applying the following five-step disability framework:

> 1. If claimant is doing substantial gainful activity, he is not disabled.
>
> 2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
>
> 3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment

17

meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997); *see also* 20 C.F.R. §§ 404.1520, 416.920. "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

At step one, ALJ Berk found that Franzel had not engaged in substantial gainful activity since her alleged disability onset date. (Tr. 13.) At step two, ALJ Berk identified these severe impairments: "status post cervical discectomy and fusion with residual cervical symptomatology; lumbar radiculitis, right carpal tunnel syndrome. (*Id.*) At step three, the ALJ concluded that Franzel did not have an impairment or combination of impairments that met or medically equaled the Administration's listed impairments found at 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*) Between steps three and four, the ALJ concluded that Franzel had the residual functional capacity to "perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the claimant requires a sit/stand option, has limited cervical motion and some limitation in the grip strength of her dominant extremity." (Tr. 14.) At step four, the ALJ found that Franzel was unable to perform any past relevant work. (Tr. 16.) At step five, the ALJ found that sufficient jobs existed in the national economy for someone of Franzel's age, education, and work experience, and with her residual functional capacity. (Tr. 16-17.) The ALJ therefore concluded that Franzel was not under

a disability from October 17, 2003, through the date of his November 17, 2010 decision. (Tr. 17.)

## III. STANDARD OF REVIEW

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited: the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted).

Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider that record as a whole. *Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been

19

cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247.

## IV. ANALYSIS

Franzel argues that the ALJ erred in two related ways. She says that the ALJ wrongly discounted her complaints of chronic pain and, "[i]n a similar vein," incorrectly discounted Dr. Kerkar's 2006 opinion about her functional limitations. (Pl.'s Mot. Summ. J. at 9-10.) The Court agrees with Franzel to this extent: the ALJ failed to show that he considered all of the factors for assessing a claimant's credibility set forth in the social security regulations and, relatedly, failed to adequately articulate why he rejected the opinion of Dr. Kerkar.

As an initial matter, much of the ALJ's credibility analysis is comprised of boilerplate language or conclusory statements. Regarding the former, the ALJ provided the following:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(Tr. 14.) This statement, found in virtually every ALJ narrative, does almost nothing to explain why a claimant's credibility has been discounted. *See Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012). The ALJ also stated (1) "[t]he claimant has asserted greater limitations than the credible medical evidence supports" and (2) "[t]he undersigned has considered the claimant's allegations and has found them inconsistent with the objective medical findings in the record. The claimant's

20

testimony is not well supported by the objective medical evidence in the record and while given appropriate consideration, it was not given significant weight." (Tr. 14, 15.) The first statement is a conclusion. As for the second, nowhere in the ALJ's narrative—save for, perhaps, his discussion of Franzel's "slightly decreased strength, tone and grip of the right upper extremity" (Tr. 15)—did the ALJ make any effort to identify which objective medical findings undermined which aspects of Franzel's testimony.

Yet, Social Security Ruling 96-7p precludes a conclusory analysis of a claimant's credibility:

> It is not sufficient for the adjudicator to make a single, conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

Soc. Sec. Rul. 96-7p, 1996 WL 374186, at *2; *see also Winhoven v. Comm'r of Soc. Sec.*, No. 12-12426, 2013 WL 4483463, at *12 (E.D. Mich. Aug. 19, 2013) (citing Soc. Sec. Rul. 96-7p and reasoning "this Court does not sit to rubber stamp [an ALJ's credibility] assessment; instead, it has the responsibility of determining whether substantial evidence supports it. . . . In discharging this important task, the Court must have some way to determine what in the record the ALJ believed was inconsistent with which parts of the claimant's testimony.").

Indeed, Ruling 96-7p further explains that because "an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone," an ALJ is to consider (1) the "individual's daily activities"; (2) the "location, duration, frequency, and intensity of the individual's pain or other symptoms"; (3) "[f]actors that

precipitate and aggravate the symptoms"; (4) the "type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms"; (5) "[t]reatment, other than medication, the individual receives or has received for relief of pain or other symptoms"; (6) "any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board)"; and (7) "[a]ny other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." Soc. Sec. Rul. 96-7p, 1996 WL 374186, at *3; *see also* 20 C.F.R. §§ 404.1529, 416.929.

The Commissioner implies that the ALJ considered several of these factors: "[t]he ALJ considered evidence of treatment, noting that it was conservative in nature (medication, musculoskeletal monitoring and management), and that her pain was partially relieved by medications." (Def.'s Mot. Summ. J. at 12 (citing Tr. 14-15).)

But the ALJ was not nearly so articulate. It is true that he mentioned that "[t]he claimant indicated that she wanted to continue with conservative treatment"; but the ALJ was referring to Franzel's statement from January 2005—when she was pregnant. (Tr. 14.) Thus, it is not at all plain that the ALJ concluded that—as a general matter—Franzel desired conservative treatment. And if that was the ALJ's implicit conclusion, it would be questionable given that he was told at the hearing, and it was reflected in the record as well, that Franzel had both insurance and personal difficulties that prevented her from undergoing a second operation on her cervical spine. Moreover, the ALJ's reference to "conservative treatment" suggests that he did not take into account the variety of pain medications, and their considerable dosages, that Franzel was consistently prescribed. *See* 20 C.F.R. § 404.1529(c)(3) ("Factors relevant to your symptoms, such as pain, which we will

consider include . . . type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms"). Indeed, throughout much of the disability period, Franzel was taking significant amounts of Percoet, a pain reliever comprised of oxycodone and acetaminophen. But that was not all: she concurrently took Soma (a muscle relaxant), Xanax (an anxiety, panic disorder, and insomnia medication), and Cymbalta for her neurological pain. Franzel additionally used Lidocaine cream to target pain in certain areas. As for the Commissioner's claim that the ALJ "not[ed]" that Franzel's "pain was partially relieved by medications," the ALJ in fact made no such notation. (*See* Tr. 14-15.) And even if he had, that conclusion would have also been questionable given that Franzel consistently reported cervical-spine pain at the eight-out-of-ten level despite her medications. (*E.g.*, Tr. 434, 488, 496, 501, 510-11, 517-18, 523-24.)

Moreover, the ALJ's narrative does not indicate that he considered other significant factors set forth in 20 C.F.R. §§ 404.1529, 416.929 and Social Security Ruling 96-7p. For instance, the ALJ said nothing about the period of time—several years—that Franzel suffered from pain and that her reports of pain to Dr. Mazhari, Dr. Kerkar, and physician assistant Wierzbicki were consistent across frequent exams. *See* 20 C.F.R. § 404.1529(c)(3) ("Factors relevant to your symptoms, such as pain, which we will consider include . . . [t]he location, duration, frequency, and intensity of your pain or other symptoms."). Nor did the ALJ note that when Franzel's activity level increased, her symptoms increased (*see* Tr. 427-28) or that when she engaged in certain activities, such as driving a long distance, accommodations were advised (Tr. 424). *See* 20 C.F.R. § 404.1529(c)(3) (providing that, in evaluating a claimant's pain, an ALJ will consider measures that the claimant uses to relieve pain "(e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.)").

23

Perhaps the most significant error in the ALJ's analysis of Franzel's credibility, however, was his treatment of Dr. Kerkar's opinion. As summarized above, Dr. Kerkar provided several functional limitations that corroborate significant aspects of Franzel's testimony. For instance, Dr. Kerkar provided that Franzel had headaches four to six times per week and that, if Franzel worked full time, she would need to break four to five times a day to either lie down or rest her head on "a high back chair" for 10 to 15 minutes. (Tr. 386, 388.) Similarly, Franzel testified that prolonged sitting, standing, and walking, along with her migraines, required her to lie down three or four times per day for twenty minutes to an hour. (Tr. 578-79.)

It is true that the ALJ did not overlook Dr. Kerkar's opinion. Instead, he explicitly rejected it: "The residual functional capacity assessment prepared by Pramod Kerkar, M.D. is given little weight because it is not consistent with the objective medical evidence (Exhibit 17-F)." The problem, however, is that this statement is inadequate to reject Dr. Kerkar's opinion.

In particular, Dr. Kerkar, by virtue of treating Franzel several times over a six-month period in 2003, including providing a course of injections, and by virtue of treating Franzel in late 2005 and early 2006, was a treating source. *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) (discussing the differences between treating, examining, and non-examining sources); *cf. Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507 (6th Cir. 2006) (providing that one visit and, "depending on the circumstances," two or three visits, do not establish a treating-source relationship). Yet, the ALJ's conclusory statement rejecting Dr. Kerkar's opinion falls well short of complying with the explanatory requirement of the treating-source rule. In particular, the social security regulations provide, "We will always give good reasons in our notice of determination or decision for the weight we give [the claimant's] treating source's opinion." 20 C.F.R. §

24

404.1527(c)(2). And "[a] Social Security Ruling explains that, pursuant to this provision, a decision denying benefits 'must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5 (1996)). The ALJ's statement that Dr. Kerkar's opinion is "not consistent with the objective medical evidence" does not suffice to satisfy the explanatory requirement of the treating-source rule. *See Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 552 (6th Cir. 2010) ("Put simply, it is not enough to dismiss a treating physician's opinion as 'incompatible' with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick."); *Fisk v. Astrue*, 253 F. App'x 580, 585 (6th Cir. 2007) ("'[A] finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected,' the agency has explained. Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *4. 'Treating source medical opinions are still entitled to deference and *must be weighed using all of the factors provided in 20 CFR 404.1527 . . . .' Id.* (emphasis added)."). The ALJ's failure to provide an adequate explanation for rejecting Dr. Kerkar's opinion therefore further supports remand. *See Rogers*, 486 F.3d at 243 ("[A] failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record."); *Sawdy v. Comm'r of Soc. Sec.*, 436 F. App'x 551, 553

25

(6th Cir. 2011) ("[W]hen an ALJ violates the treating-source rule, '[w]e do not hesitate to remand,' and 'we will continue remanding when we encounter opinions from ALJ[s] that do not comprehensively set forth the reasons for the weight assigned to a treating physician's opinion.'" (quoting *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009))).

None of the Commissioner's arguments persuade the Court to reach a different conclusion. The Commissioner addresses Franzel's claims about Dr. Kerkar's opinion in a footnote. (Def.'s Mot. Summ. J. at 10.) She says:

> The ALJ discussed Dr. Kerkar's 2003 examination findings and 2006 opinion, and explained that he assigned this opinion little weight because it was not consistent with other medical evidence in the record (Tr. 15, 385-87). This was a reasonable assessment, given Dr. Kerkar's examinations took place in 2003, and subsequent findings by other physicians did not support the extreme limitations in his 2006 opinion.

(*Id.*) Besides being cursory, this argument is factually incorrect. Dr. Kerkar evaluated Franzel in November 2005 and January 2006—the latter assessment being about three weeks before he offered his functional capacity assessment. (Tr. 369-71; 385-89.)

The Commissioner also cites objective evidence that she says shows that the ALJ reasonably discounted Franzel's testimony. (Def.'s Mot. Summ. J. at 10.) But several of the cited tests pertain to Franzel's lumbar-spine problems (*see id.*); yet, Franzel's primary problem was her cervical spine.

The Commissioner also says that "the ALJ noted that a computed tomograph (CT) scan of the cervical spine from July 2004 indicated . . . ." (Def.'s Mot. at 10.) But upon a review of the ALJ's narrative, the ALJ did not note any such study. (*See* Tr. 14-15.) In any event, the fact that a claimant's testimony is not corroborated by the objective evidence is not, by itself, a sufficient basis for rejecting the claimant's alleged functional limitations. 20 C.F.R. § 404.1529(c)(2) ("[W]e will

26

not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements.").

Additionally, the Commissioner argues that Franzel's activities of daily living are contrary to her testimony. (Def.'s Mot. at 12.) This might be so, but the problem is that the ALJ did not reach that conclusion. In fact, he made no mention of Franzel's activities of daily living.

Finally, the Commissioner claims that Dr. Montasir's consultative examination report supports the ALJ's decision to discount Franzel's testimony. (Def.'s Mot. at 11.) But the ALJ never explained how any of Dr. Montasir's findings were inconsistent with Franzel's claims, let alone with her claims that she needed to lie down due to migraines or after sitting, standing, or walking too long. (*See* Tr. 15.) In fact, it is unclear whether the ALJ even credited Dr. Montasir's findings: the ALJ never said so and he assigned "little weight" to Dr. Claire's file-review assessment which relied, in part, on Dr. Montasir's findings. (Tr. 15, 149.)

In short, remand is required. Franzel asserts that the remand should be for an award of benefits. (Pl.'s Mot. Summ. J. at 17.) But, as Franzel acknowledges, "[i]f a court determines that substantial evidence does not support the Secretary's decision, the court can reverse the decision and immediately award benefits only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher v. Sec'y of Health & Hum. Servs.*, 17 F.3d 171, 176 (6th Cir. 1994). In this case, based on its review of the record, the Court believes that there might be legitimate bases that an ALJ could articulate to discount portions of Franzel's testimony and Dr. Kerkar's opinion. As such, an ALJ should adequately address the factors set forth in 20 C.F.R. § 404.1529(c)(3) and 20 C.F.R. § 404.1527(c)(2) in the first instance.

The Court notes, however, that Franzel filed her application for disability benefits over nine years ago. The Court strongly urges the Commissioner to expedite her case on remand.

## V. CONCLUSION AND RECOMMENDATION

For the reasons set forth above, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 16) be GRANTED IN PART, that Defendant's Motion for Summary Judgment (Dkt. 18) be DENIED and that this case be REMANDED to the Commissioner for a proper credibility assessment.

## VI. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the

response. E.D. Mich. LR 72.1(d)(3), (4).

S/Laurie J. Michelson     
Laurie J. Michelson
United States Magistrate Judge

Dated: December 18, 2013

---

**PROOF OF SERVICE**

The undersigned certifies that the foregoing document was served upon the parties and/or counsel of record via the Court's ECF System and/or U. S. Mail on December 18, 2013.

s/Jane Johnson
Case Manager to
Magistrate Judge Laurie J. Michelson